UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

CRIMINAL NO. 07-08-DCR

UNITED STATES OF AMERICA                                                    PLAINTIFF

VS:                    RECOMMENDED DISPOSITION
                         OF MOTION TO SUPPRESS

RANDALL THOMAS ZELLARS                                                    DEFENDANT

\* \* \* \* \*

The Court considers a motion to suppress evidence filed by Defendant Randall Zellars. *See* DE# 25. Defendant filed a motion challenging evidence found during a search of his residence and challenging the admissibility of statements by him during custodial interrogation. The United States responded, *see* DE# 29, and the Court conducted a full evidentiary hearing on March 30, 2007. After permitting and receiving post-hearing briefs, *see* DE## 40 & 48, the matter now stands ripe for review.

INTRODUCTION

Authorities in Manchester, Kentucky arrested Defendant on December 31, 2006 for suspected DUI. At the time of the arrest, Defendant allegedly possessed a .22 firearm. Because of Defendant's alleged prior felony record, authorities contacted BATF Agent Tom Chittum, who investigated whether such possession would violate 18 U.S.C. § 922. *See generally* DE# 16 (Statement of Findings and Reasons For Detention).

1

On January 5, 2007, while Zellars remained in state custody on the DUI charge, federal law enforcement arranged to question[1] Defendant at the Manchester Police Department. The interview encompassed the potential firearm violation as well as an unrelated federal inquiry about which authorities thought Zellars might have knowledge. During the interrogation, Zellars made arguably incriminating statements concerning weapon possession and his prior record germane to a § 922 charge. Zellars also allegedly granted a consent to search his residence. The statements and search results, along with the evidence seized as part of the DUI arrest, led to the return of a federal indictment against Zellars.

On January 25, 2007, premised on Zellars's criminal record, the grand jury charged Zellars with illegal possession of the firearm seized at the time of his DUI arrest and assorted ammunition (Count 1, § 922(g)(1)) and illegal possession of a ballistic vest found by authorities as part of the residence search (Count 2, 18 U.S.C. § 931).[2]  *See* DE# 1 (Indictment).

In the instant motion, Zellars argues that the United States violated *Miranda* in securing the statements Zellars made on January 5, 2007. Zellars also argues that the warrantless search of his residence was illegal because he did not validly consent to that search. The United States contests both arguments.[3]

---

[1] Though the parties assign importance to the term, the Court uses question, interview, and interrogate interchangeably; without a doubt, Defendant was in custody, and the term used in this Order reflects no normative content.

[2] Interestingly, although the United States found another firearm at Zellars's residence, *see* DE# 16, at 3 (Statement of Reasons), that firearm is not included in the indictment. The indictment also includes a forfeiture count as to the charged firearm and ammunition.

[3] The Court notes that Defendant's suppression effort does not extend to the firearm seized as part of the DUI arrest. That firearm is the sole basis for Count 1 of the indictment. Defendant

At the suppression hearing, the Court permitted both parties a full and complete opportunity to present proof and argument. The Court, having accounted for the burdens applicable in the suppression context, and having made necessary credibility determinations based on the content of the hearing, issues its recommendation. For the reasons that follow, the Court recommends that the District Court DENY the motion to suppress. The United States complied with *Miranda*, and Defendant's statements were voluntary. Further, Defendant validly consented to the search of his residence. No basis for suppression exists.

## I.  INTERROGATION AND CONSENT EVENTS

Defendant's post-hearing brief aptly characterizes the conflict in testimony presented by the parties: "The agents' account of what transpired diverges sharply from Zellars' account." *See* DE# 40, at 3. Although all witnesses agreed that authorities transported Zellars from the Clay County jail to the Manchester Police Department on January 5, 2007, and then questioned him, the defense and prosecution stories otherwise scarcely converged.

The United States presented proof from BATF Agent Chittum and FBI SA Timothy Briggs. Manchester Police Officer Jeff Culver, though called by the defense, also testified. The defense further presented Randall Zellars, who limited his testimony to the interrogation and consent circumstances.

*Chittum*

Agent Chittum testified in support of a valid *Miranda* waiver and a valid consent search. His testimony included the following:

---

does challenge statements made, related to that firearm, during the January 5 interrogation.

3

- Chittum agreed that the interview occurred "in custody . . . [at] the police department." *See* DE# 32 (hereafter, "Tr."), at 8. He witnessed Zellars's *Miranda* rights waiver. *See id.* at 9. The agents read the entirety of the written waiver form to Zellars, went over "each and every one" of the rights, and Zellars indicated that he understood the rights involved. Chittum sponsored admission of the written *Miranda* waiver. *See id.* at 9-10; Tr. Exhibit 1.

- Chittum himself secured written consent from Zellars for a search of Zellars's residence. *See id.* at 12. Chittum "read this form verbatim" to Zellars and witnessed Zellars's signature. *See id*. at 13; *see also id.* Exhibit 2. According to Chittum, Zellars at no time withdrew the written consent, and Chittum specifically took Zellars to the search area to facilitate consent withdrawal, should Zellars have elected to terminate the search. *See id.* at 14. Per Chittum, the waiver of rights preceded the consent to search. *See id.* at 17.

- Chittum expressly denied any threats or coercion related either to the *Miranda* waiver or to the search consent. *See id.* at 10, 13. Authorities did not display "firearms" or otherwise "show force" relative to the interview or consent request. *See id.* at 16. Indeed, Chittum described the tone of the interaction as "very conversational." *See id.* "He [Zellars] sat outside the doorway and smoked cigarettes and joked. It was not at all adversarial." *Id.*

- Chittum estimated that the interview lasted "an hour and a half, an hour and 40 minutes." *See id.* at 18. He admitted speaking with Zellars prior to the formal interview, but he characterized the interaction as mere conversation, with nothing, pre-waiver, "relevant to this case" and "nothing at all in the form of an interview." *See id.* at 20.

- Chittum expressly denied that Zellars ever asked to speak with counsel. *See id.* at 10, 21.

- Chittum agreed that Zellars "wouldn't have been able to read" the forms at the time of the interrogation, perhaps because he needed his glasses. *See id.* at 22.

- When Chittum learned that Zellars had another gun at home, Chittum did seek permission to search. He stated, "I told him that if he wanted me to, I would go and get a search warrant." *See id.* at 24. According to Chittum, Zellars waived his rights and consented to the search in response to the first request by law enforcement. *See id.* at 26.

4

*Culver*

Jeff Culver, a Manchester Police Officer, also testified. Culver testified that he "may have" handcuffed Zellars in transit from the jail to the police department. *See* Tr. at 30. Culver specifically and emphatically rejected the suggestion, on cross-examination, that he had denied Zellars his right to counsel:

> Q: He said he wanted his lawyer there and you said he didn't need any lawyer. And he said "I want to go back to jail."
> A: That is incorrect.
> Q: All right. You don't remember any of that or you're saying it didn't happen?
> A: That did not happen.

*Id.* at 32-33. Culver definitively remembered little else about the January 5 events.

*Zellars*

Zellars himself testified in detail at the suppression hearing, and his depiction substantially contradicted Chittum's. His recollection included the following:

- Zellars, in his testimony, focused intently on the issue of his right to counsel. According to Zellars, he already had retained Attorney Charles on the DUI charge, *see id.* at 39, and he demanded access to counsel on the way from the jail to the police station. *See id.* at 40 ("I need my lawyer down there."). Zellars claimed Officer Culver flatly denied the invocation: "No. Stephan Charles is not coming down there." According to Defendant, Charles already had appeared on his behalf in state court concerning the DUI charge. *See id.* at 68.

- Zellars, who identified Chittum, Agent Briggs, Culver, and a fourth officer as involved in the interview, testified that he repeatedly invoked (but was denied) his right to counsel before, during, and after the interrogation: "I might have asked eight or nine times for a lawyer. Kept insisting on a lawyer." *See id.* at 44-45; *see also id.* at 51 ("I asked for a lawyer several times. Even counting the cruiser, maybe 12 times."); *id.* at 54 ("All through the interview. The conversation in the car. All through the ordeal. No, no, no. Every time I'd ask about a lawyer, they'd say, 'No.'"); *id.* at 55 ("From the time I was in the car to the time at my house, that's all that came out of my mouth was about a lawyer. And they said . . . Stephan Charles, he wasn't coming down there."); *id.* at 61 ("I asked for a lawyer to be present. They said, 'No. You'll answer our questions and you'll answer them now.'").

5

- Zellars was equally categorical about whether authorities discussed or advised him of his constitutional rights, in any fashion. According to Zellars, no one mentioned or referenced any of his constitutional rights at any time. "Nobody said a word." *Id.* at 43; *id.* at 46 (referencing consent form: "He never said any of these things to me.").

- Zellars admitted that he did consent to the search. *See id.* at 59 (agreeing that he "knowingly and voluntarily consented to" the search). However, Zellars also characterized the consent (and waiver) environment as coercive. In addition to the denial of counsel, Zellars felt that authorities improperly threatened him concerning the gravity of the imminent gun charge and concerning the damage law enforcement would inflict on Zellars's home if he refused to consent, necessitating a warrant. *See id.* at 41-42 ("[T]hey said, 'Well, you can make it easier on yourself, because that gun carries 10 years . . . we got you dead right. You know, you're a felon."); *id.* at 59 ("I was told that if I didn't sign it [the consent] they were going to go up to my house and tear it up.").

- In addition, Zellars claimed hostility and overtly coercive tactics. With reference to the four officers involved, Zellars stated, "[T]hey were all over me and screaming and hollering. And Jeff Culver, he was 'You know, you know!' He hollering at me, all four of them hollering at me. . . And they all around me and I'm sitting down, and I'm nervous and looking all around at them and I started crying." *See id.* at 60.

- Zellars also complained that he did not have his reading glasses, and thus could not read any of the forms. *See id.* at 43-44. Still, Zellars admitted signing one or more of the waiver documents. *See id.* at 50 (referencing *Miranda* waiver); *id*. at 43 ("I signed some documents down there."). Zellars felt certain medications he had taken had compromised his ability to handle the events of January 5. *See id.* at 48 (describing "drowsy" condition); *id.* at 64 (agreeing that he was not "thinking very clearly" or "sure what was going on" that morning).

- Concerning miscellaneous issues related to his own background, and to the contested events, Zellars testified that he is literate and has a twelfth grade education. *See id.* at 63. Zellars agreed that he was not handcuffed during the interrogation itself, *see id*. at 67, and that authorities had provided him a beverage during the interview. *See id*. at 64. Zellars conceded that he has significant experience in the criminal justice system, having been "arrested many times and taken into court for charges." *See id*. at 61.

*Briggs*

Finally, FBI SA Briggs testified concerning the January 5, 2007 events. Like Chittum, Briggs's story differed significantly from that of Defendant Zellars:

- Briggs confirmed that he provided the *Miranda* warnings "at the beginning of the interview." *See id.* at 71. According to Briggs, he read the Exhibit 1 form to Zellars in its entirety, and Zellars signed. *See id.* at 73, 74. Briggs was emphatic in his memory of orally rehearsing the rights: "I know for a fact I read it out loud to him, asked him if he had any questions. He said he had no questions. I asked him if he understood it and he said he understood it." *See id.* at 85.

- Briggs denied that Zellars ever requested counsel. *See id.* at 74. Further, Briggs overtly denied making "any threats or promises to Mr. Zellars." *See id.* Briggs testified that the *Miranda* waiver preceded any "questioning whatsoever." *See id.* at 75.

- Briggs also supported the validity of search consent. He witnessed Zellars sign the form after an officer read the form to Zellars. *See id.* at 76. Zellars, at no time, withdrew the consent. *See id.*

- Briggs also addressed the issue of any threat concerning search consent. Briggs agreed, "I told him we would attempt to get a search warrant [in the absence of consent]." *See id.* at 87. Briggs also agreed that, relative to the potential gun charge, authorities had discussed with Zellars the "benefit of . . . cooperating with us." *See id.* at 86. Briggs characterized that discussion as something "we always tell an individual." *See id.*

- In addition to denying that Zellars ever asked for a lawyer, *see id.* at 73, Briggs also denied that Zellars indicated he already had retained a lawyer concerning the state DUI matter. *See id.* at 90.

- Briggs agreed that Zellars "broke down in tears" at one point; he attributed the emotion to Zellars's discussion of "concern[] about his daughter." *See id.* at 78.

- Briggs denied noticing that Zellars acted compromised in any way related to drugs or medication. According to Briggs, Zellars displayed no impairment, was "at his wits," and "understood [Briggs's] questions ... and answer[ed] appropriately." *See id.* at 79; *id.* at 80 (indicating he "wouldn't attempt to interview" a person "under the influence of a medication").

7

- Briggs testified that authorities had offered Zellars "breaks" and "something to drink" during the interview. *See id.* at 77-78.

*Exhibits*

The tendered exhibits included the putative *Miranda* waiver (Exhibit 1), the consent (Exhibit 2), and docket entries from the state DUI record. (Exhibit 3). Exhibits 1 and 2 are standard waiver and consent forms that, if followed, would appear to comply validly with the content required for the subject matter concerned. Defendant argues the circumstances of execution, not the content of the writings. Exhibit 3 seems to indicate, as Defendant now concedes, that Stephan Charles had not appeared on Defendant's behalf in the state proceedings by the time of the January 5 interrogation.

## II. LEGAL STANDARDS

### *Miranda* **waiver**

The coerciveness viewed as inherent in custodial interrogation led to *Miranda*'s prophylactic rules to protect Fifth and Sixth Amendment rights:

> It is without question that "incriminating statements elicited from suspects in custody cannot be admitted at trial unless the suspect was first advised on his or her *Miranda* rights." *United States v. Salvo*, 133 F.3d 943, 948 (6th Cir. 1998). As with the waiver of consent to search, the government has the burden of proving that a defendant validly waived his or her *Miranda* rights. In order for a *Miranda* waiver to be valid, it must be voluntary, knowing and intelligent, under the totality of the circumstances. Additionally, "there must be an element of police coercion in order for a waiver to be found involuntary." *Seymour v. Walker*, 224 F.3d 542, 554 (6th Cir. 2000).

*United States. v. Walls*, 116 Fed. Appx. 713, 717 (6th Cir. 2004)(citations omitted).

In the context of an alleged *Miranda* waiver, the United States bears the burden of proving a valid waiver by "a preponderance of the evidence." *See Colorado v. Connelly*, 107 S. Ct. 515, 522 (1986); *see also Missouri v. Seibert,* 124 S. Ct. 2601, 2608 n. 1 (2004)(noting "prosecution bears the burden of proving, at least by a preponderance of the evidence, the *Miranda* waiver and the

8

voluntariness of the confession") (citations omitted).

>Further,

>The inquiry has two distinct dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances. . . " reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 106 S. Ct. 1135, 1141 (1986). The dual inquiry "means the government must establish that it was more likely than not that a defendant was read his *Miranda* rights and acknowledged that he had a right to remain silent." *United States v. Spaulding*, 446 F. Supp.2d 789, 800 (N.D. Ohio 2006). In addition to the issue of an effective warning, the voluntariness inquiry involves three factors: the presence of objectively coercive activity; a subjective analysis of whether the coercion "was sufficient to overbear the will of the accused"; and, whether police misconduct was the "crucial motivating factor" behind a decision to confess. *See McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir. 1988).

### Consent to Search

Warrantless searches are per se unreasonable under the Fourth Amendment–subject to specifically established and delineated exceptions. *See Katz v. United States*, 88 S.Ct. 507, 514 (1967); *United States v. Roark*, 36 F.3d 14, 17 (6th Cir. 1994). Consent to search is one such exception. *See Roark*, 36 F.3d at 17; *United States v. Taylor*, 956 F.2d 572, 589 n.14 (6th Cir. 1992). When the constitutionality of a warrantless search rests on consent, the government has the burden of proving that the defendant freely and voluntarily provided the necessary consent. *See Florida v. Royer*, 103 S.Ct. 1319, 1324 (1983); *Bumper v. North Carolina*, 88 S.Ct. 1788, 1792 (1968). The

United States thus bears the burden on this issue, by a preponderance, and must show "clear and positive" evidence that it obtained valid consent. *See United States v. Moore,* 130 Fed. Appx. 728, 734 (6th Cir. 2005); *United States v. Riascos-Suarez*, 73 F.3d 616, 625 (6th Cir. 1996).

Whether consent is voluntary or the product of duress or coercion hinges on analysis of the totality of the circumstances. *See Schneckloth v. Bustamonte*, 93 S.Ct. 2041, 2047-48 (1973). Relevant circumstances to be considered, concerning the accused, include evidence of: minimal schooling; low intelligence; age; whether authorities advised the accused of his rights; the length of any detention prior to consent; prolonged or repeated questioning; and the use of physical punishment, such as deprivation of food or sleep. *See id.* at 2047; *United States v. Crowder*, 62 F.3d 782, 787 (6th Cir. 1995). Other factors identified by the Supreme Court involve whether the defendant is a "newcomer to the law," the location or setting at the time a defendant consented, and whether the police used promises or threats of force. *See United States v. Watson*, 96 S.Ct. 820, 828 (1976); *Crowder*, 62 F.3d at 787. Custody is a factor, but not a determining factor, in the analysis. *See Watson*, 96 S.Ct. at 828..

*Schneckloth* cautions the Court to consider "all the surrounding circumstances–both the characteristics of the accused and the details of the interrogation." *See Schneckloth*, 93 S. Ct. at 2047. The analysis calls for a detailed factual evaluation, which does not "turn[] on the presence or absence of a single controlling criterion." *See id.*

III. FINDINGS AND ANALYSIS

The Court has evaluated all evidence presented and has assessed the credibility of each testifying witness, in light of the legal standards applicable in this context.

Much of the task presented turns on resolving the conflict between the interrogation version of Defendant Zellars and that of Agents Chittum and Briggs. If the Court accepted Defendant's version, the depicted multiple violations of Defendant's right to counsel would compel a ruling in favor of Zellars. *See, e.g., Arizona v. Roberson*, 108 S. Ct. 2093, 2096 (1988)("[A] suspect who has 'expressed his desire to deal with the police only through counsel is not subject to further interrogation by the authorities until counsel has been made available to him[.]")(citing *Edwards v. Arizona*, 101 S. Ct. 1880, 1884-85 (1981)). According to Zellars, the officers involved flagrantly violated his right to counsel, blocking his access to counsel over a dozen times and demanding that Zellars answer all questions without representation. This conduct, if it occurred, would infect the statements secured and would vitiate the search consent.

The Court does not credit Zellars's version. His testimony reflects a fanciful and grossly exaggerated description that strikes the Court as incredible. As one example: Zellars insisted that he demanded counsel almost immediately. He then reported that he separately demanded counsel eight or nine times, before upping that estimate to *twelve* times. Finally, he described every word "out of my mouth" during the interview as involving invocation of his right to counsel. The claim is far-fetched and seemed to grow progressively more shocking over the course of the hearing.

Indeed, Zellars also inaccurately contended that Officer Culver knew, by January 5, that Defendant's counsel already was Stephan Charles. Zellars indicated that Culver denied him counsel by *specific reference* to Attorney Charles, and Zellars testified that Charles already had formally

appeared in state court for him on the DUI charge. The docket sheet contradicts that assertion, showing that Attorney Charles did not appear until well after the January 5 events.[4] This undercuts the credibility of Defendant.

Further, to believe Zellars's version, the Court also must accept that four separate members of law enforcement,[5] from four separate federal or state agencies, determined to engage in rank deprivation of clearly established constitutional rights. Certainly, conduct by law enforcement deserves close scrutiny, particularly in the context of constitutional rights. However, the Court simply does not believe, based on the testimony, that the Zellars version is true in this case. Unlike the testimony of Defendant, the testimony of Chittum and Briggs is independently and collectively consistent. Further, the agents' versions directly jibe with the written documents Zellars signed.

Those documents, Exhibits 1 and 2 to the hearing, recite all applicable constitutional rights and evidently bear Zellars's signature. Both agents testified that authorities read the documents to Zellars and secured his signature. Zellars admits that he, at least, signed the *Miranda* waiver, and Zellars agrees that he knowingly and voluntarily consented to the search. The Court finds that Zellars signed both waiver documents, after hearing the content of the documents orally, and both documents recite that no threats or coercion prompted execution. The testimony of Chittum and Briggs, along with Exhibits 1 and 2, provide "clear and positive testimony" that Defendant validly

---

[4] In his post-hearing brief, Defendant characterizes that error, *i.e.*, reference to Charles's appearance, as an "obvious misstatement[] and exaggeration[]." *See* DE# 40, at 3.

[5] All witnesses agreed that Chittum, Briggs, Culver, and TFO Blair participated, to some degree, in the interview.

consented to the search. That evidence also establishes that authorities complied with *Miranda*, and that any statements Zellars made issued from a knowing, voluntary, and intelligent waiver.

Zellars's fantastic description as to the counsel issues colors the Court's assessment of credibility in other contexts. The Court finds that the interrogation and consent scenarios did not occur in the manner Zellars described. Instead, the Court believes that the agents conducted the interview in a manner that was not unduly threatening or coercive. Although authorities discussed the potential charges against Zellars, an analysis of the legal predicament of a defendant, and ways to improve that predicament, is not inherently improper and would seem to be a common interview topic. Further, merely suggesting that authorities would secure (or attempt to secure) a warrant if a party does not consent to a search is not unduly coercive. *See, e.g., United States v. Nappier,* 155 Fed. Appx. 859, 867 (6th Cir. 2005)("[T]his Court has previously indicated that such statements [i.e., an intent to obtain a warrant if defendant declined consent] do not vitiate consent.").

Certainly, some elements of the situation support Zellars's position concerning voluntariness. The location of questioning is, in the Court's view, a factor weighing against consent. *Schneckloth* itself expressly dealt with noncustodial consent, as opposed to "the specter of incommunicado police interrogation in some remote station house." *See Schneckloth*, 93 S. Ct. at 2058. This interrogation undoubtedly was at the "station house," and authorities took Defendant to and from the interview in handcuffs. Further, Zellars admittedly did not have his reading glasses and did, at some point, weep during the interview. Further, Zellars contends medication had affected his ability to perceive events clearly. These factors are part of the overall totality of the circumstances presented, but do not, in the Court's view, change the result.

The additional consent and waiver factors gather in favor of validity. Defendant is mature, at 52 years old. Defendant has a twelfth grade education and is literate. Defendant does not argue that he is "mentally deficient" or lacks at least average intelligence. *See Watson*, 96 S.Ct. at 828; *Schneckloth*, 93 S.Ct. at 2047. Moreover, Defendant's criminal history reflects that he certainly is no "newcomer to the law." *See Watson*, 96 S.Ct. at 828. Indeed, the pretrial record indicates that Defendant had at least three convictions since 2005 alone. Defendant also has an adult felony conviction, and many other arrests not resulting in conviction. *See* DE# 16 (Statement of Reasons and Findings for Detention). On this record, "[b]ased on his extensive encounters with law enforcement, there is little doubt he knew about his right to refuse consent" as well as other applicable rights. *See United States v. Simpson,* 2007 WL 760510, at *3 (M.D. Tenn. Mar. 8, 2007); *see also* Tr. at 46 (testimony from Zellars agreeing that he's "been through the system several times" and understands "the importance of having a lawyer"). Zellars was on a first-name basis with Officer Culver. *See* Tr. at 40.

The custodial interview was less than two hours long, not an inherently unreasonable length of detention. Further, Agent Chittum testified that Zellars agreed to waive his *Miranda* rights and to consent to the search on the first request for each. The Court credits the agents' description of the overall tone of the interview as "cordial" and "conversational," despite Zellars's contrary story. The threat of prosecution may have induced Defendant to cry, relative to the effect on his daughter, but the Court does not believe overreaching or intimidation by law enforcement improperly caused that result, or most importantly, infected the waivers. The Court does not credit the testimony, by Zellars, that medication affected the validity of his consent. He testified only to taking cold medicine and other analgesics, and Briggs noted nothing in Zellars's demeanor that would implicate

a competency issue at the time. *See United States v. Purcell,* 2007 WL 926972, at *4-5 (E.D. Ky. Mar. 26, 2007)(rejecting ingestion of drugs as affecting consent "when that person is coherent and fails to exhibit any visible impairment").

Based on the totality of the circumstances, and the applicable standards, the Court finds by a preponderance of the evidence that the United States has proven a knowing and voluntary *Miranda* waiver and by the same standard has proven, through clear and positive testimony, that Zellars gave the relevant consent to search freely and voluntarily.

## IV.  RECOMMENDATION

For all the reasons stated, the Court recommends that the District Court deny the Motion to Suppress filed by the Defendant.  *See* DE #25.

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights concerning this recommendation, issued under subsection (B) of said statute.  Pursuant to agreement of counsel, within five days after being served with a copy of this recommended decision, any party may serve and file written objections to any or all portions for consideration, de novo, by the District Court, with any written responses thereto being filed within five days.  *See* DE #31.

This the 26th day of April, 2007.

Signed By:
*Robert E. Wier* REW
United States Magistrate Judge